STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

SAILAJA M. PAIDIPATY (NYBN 5160007)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    sailaja.paidipaty@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 20-480-02 WHA |
| Plaintiff, | **UNITED STATES SENTENCING MEMORANDUM** |
| v. | Judge: Hon. William Alsup |
| LEYDIS YANETH CRUZ, | Sentencing Date: April 12, 2022<br>Time: 2:00 p.m. |
| Defendant. | |

## I.   INTRODUCTION

When the Drug Enforcement Administration (DEA) arrested Jairo Noel Rodriguez in 2019 for drug trafficking, his girlfriend, Leydis Yaneth Cruz took over where he left off and soon made a name for herself as a leading Bay Area fentanyl supplier. Her son, Emilson Cruz Mayorquin, had already been involved in fentanyl trafficking and soon Leydis,[1] Emilson, Pamela Carrero (Leydis's daughter), Ivan Cruz Mayorquin (Leydis's brother), and others ran a robust family business. Intercepted calls indicate that Leydis was the lynchpin of the group; not only did she sell to drug customers, but she also supplied her family members. On numerous calls, Emilson and Ivan asked Leydis to provide them with

---

[1] Because numerous co-defendants in this case share a last name, the government will refer to some individuals by their first name in order to avoid confusion.

USA SENT. MEM.
20-480-02 WHA

1

ounces of fentanyl for resale. Through her connections with mid-level drug suppliers, Leydis procured a variety of fentanyl that the drug trafficking organization (DTO) redistributed. As described in the Criminal Complaint and in the Presentence Reports ("PSR"), in recent years law enforcement has learned that traffickers and drug users often refer to types of fentanyl by color; the color references either the physical color of the substance or the color that it emits when burnt. *See* Dkt. 1, Compl. ¶ 19; PSR ¶ 12. On intercepted calls, Leydis described the various types of fentanyl that she possessed for retail, including "blue," "yellow," and "purple." *See* PSR ¶¶ 12-13. Further, the DTO sourced and sold counterfeit pharmaceutical pills containing fentanyl. On two occasions, Leydis and Carrero sold fentanyl and these counterfeit pills containing fentanyl to an undercover agent. PSR ¶ 16. Finally, the scope of the organization went beyond fentanyl sales. *See e.g.* PSR ¶ 14. At the time of Leydis's arrest in December 2020, agents seized approximately 1,422.5 gross grams of fentanyl, 153.1 gross grams of cocaine, and 276.5 gross grams of methamphetamine from the apartment that she shared with her Carrero, her minor daughter, and Carrero's minor son. PSR ¶ 19.

Leydis was no small-time drug dealer and intercepted calls show she knew the profit to be made in fentanyl sales. At the same time, the government recognizes that difficulties that she faced in her life prior to turning to crime. The PSR details extensive past physical abuse at the hands of her family members and romantic partners. In addition, there is a chance Leydis may lose parental rights over her minor daughter. The federal government defers to the state court process regarding the merits and outcome of the child custody case but recognizes that losing custody of a child is considerable collateral consequence.

Considering the sentencing factors together, the government concurs with the recommendation of the U.S. Probation Office and recommends the imposition of a 41-month sentence, followed by a mandatory four-year term of supervised release, a $100 special assessment, and forfeiture. The recommendation constitutes a one-level downward variance from the final offense level, which inclusive of safety valve, is a level 23 and at a Criminal History Category I results in an advisory Guidelines range of 46-57 months.

//
//

## II. PROCEDURAL POSTURE

On December 8, 2020, the Honorable Jacqueline Scott Corley, U.S. Magistrate Judge, issued a Criminal Complaint charging Leydis and five co-defendants with conspiring to traffic fentanyl in the Bay Area. Dkt. 1. In conjunction with the Complaint, the Court issued warrants authorizing the arrest of Leydis and her co-defendants. *Id.* Two days later on, December 10, 2020, federal agents arrested Leydis and six other individuals (the five co-defendants charged in the Complaint as well as one other individual, Mayer Benegas Medina who was charged the same day in a separate Complaint, *see* 20-mj-71816-MAG). The following week, a federal grand jury returned an Indictment charging Leydis and the six individuals arrested on the day of the takedown. Dkt. 23. Leydis was charged with participating in a conspiracy to traffic fentanyl and with two counts of distribution of fentanyl. *Id.*

On December 7, 2021, Leydis entered a guilty plea to Count Five of the Indictment pursuant to a written agreement with the government.

## III. SENTENCING GUIDELINES CALCULATION

The parties and Probation are in agreement with the U.S. Sentencing Guidelines calculation set forth in the written plea agreement. *See* PSR ¶ 3. That agreement reflects a base offense level of 28. PSR ¶ 33. At the time of the issuance of the final PSR, defendant had yet to satisfy the requirements of the federal safety valve set forth in 18 U.S.C. § 3553(f). Since then, however, Leydis completed the outstanding requirements, and the parties agree that a two-level reduction should be applied to the Guidelines calculation. In addition, the Court is not bound by the 60-month mandatory minimum applicable to the statute of conviction.

Accordingly, the applicable Guidelines calculation is as follows:

 a. Base Offense Level (U.S.S.G. §§ 2D1.1(a)(5), (c)(6)):   28
    (At least 280 grams but less than 400 grams of fentanyl)
 b. Acceptance of Responsibility (U.S.S.G. § 3E1.1(a):   - 3
 c. Safety Valve (U.S.S.G. § 5C1.2):   -2
 d. Final Offense Level   23

The parties and Probation agree that Leydis is a Criminal History Category I, resulting in an advisory Guidelines range of 46-57 months. As noted above, the government and Probation both seek

the imposition of a 41-month sentence, which constitutes a one-level downward variance from the Guidelines range.

## IV.   GOVERNMENT'S SENTENCING RECOMMENDATION

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin by calculating the correct sentencing range under the Sentencing Guidelines. Id. The Guidelines are "the 'starting point and the initial benchmark,'" *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011) (quoting *United States v. Kimbrough*, 552 U.S. 85, 108 (2007)), and the Court should "remain cognizant of them throughout the sentencing process." *United States v. Gall*, 552 U.S. 38, 50 n.6 (2007). After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93. Here, the most important considerations are the nature and circumstances of the offense, the history and characteristics of the defendant, the need to afford adequate deterrence, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(6).

### A.   Leydis supplied fentanyl to her co-conspirators, other drug resellers, and individual drug users.

Throughout 2020, Leydis established herself as a known fentanyl trafficker in the greater Bay Area. Intercepted calls indicate that she provided drugs to a wide variety of individuals, including her co-conspirators, other drug resellers, and individual users who purchased gram quantities at a time. Of particular note in assessing her culpability against her co-defendants is the fact that Leydis often served as a source of supply for her co-conspirators, including her son, who was known to sell large quantities of fentanyl. For example, during a call on August 29, 2020, Emilson called his mother and asked if she could help him get one ounce of "azul," meaning blue fentanyl. Declaration of Sailaja M. Paidipaty (Paidipaty Decl.) at Exhibit A, Line Sheets, Call 404. Leydis said she had an ounce that she could provide him and that she had another ounce that she was saving for a client in San Francisco. *Id.* Emilson said he would swing by later that day to pick up the drugs. *Id.*

During a different call two days earlier, Leydis's brother (and co-defendant), Ivan asked if

USA SENT. MEM.                                      4
20-480-02 WHA

Leydis could provide him with one ounce of "amarillo," meaning yellow fentanyl. Paidipaty Decl., Exhibit A, Line, Sheets, Call 300. Leydis agreed to provide the drugs. *Id.* Ivan then noted that he still owed Leydis money for the "morado" – i.e. purple fentanyl – that he had bought from her previously. *Id.* The two confirmed the amount owed and Leydis told her brother not to worry about it. *Id.*

These two calls, which occurred over the span of three days, show that at any given time Leydis possessed several ounces of different varieties of fentanyl for redistribution. As noted in the Criminal Complaint, a two-milligram dose of fentanyl can be a fatal dose.[2] An ounce, approximately 28 grams, then equals over 14,000 potentially deadly doses of fentanyl.

Other intercepted calls show that Leydis sold redistribution quantities of drugs to other narcotics resellers, and she also sold gram quantities to individual users. In this way, Leydis provided a variety of products to a variety of customers. For example, on August 22, 2020, an unknown male using a phone number ending in 6656 (UM-6656) told Leydis that he needed "six whole ones." Paidipaty Decl., Exhibit A, Line Sheets, Call 45. Leydis asked if the individual wanted "blue ones," meaning blue fentanyl. UM-6656 said, "Yes." *Id.* Leydis responded that she would "call the guy" to see what time he would come by. She further stated that she would give UM-6656 a discount. *Id.* Based on their review of this and subsequent calls, agents believe UM-6656 was asking to purchase six ounces of blue fentanyl ("six whole ones") and that Leydis indicated that she would call her source of supply ("the guy") to see when he could bring her that quantity of drugs.

Further, the Criminal Complaint describes a conversation between Leydis and Ivan where they discussed the price of a single gram of fentanyl, which is more akin to what a drug user rather than reseller would purchase. During the conversation, Leydis observed that Ivan could charge an even higher price because the most sought-after fentanyl (blue fentanyl) was in high demand but fairly low in supply. Ivan stated that customers were "asking for the blue." Dkt. 1, Crim. Compl. ¶ 24. Leydis responded, "That man just called me and said tomorrow he would, he would sell me some." *Id.* Agents believe the reference to "[t]hat man" is a reference to Leydis's source of drug supply. *Id.* ¶ 25. Ivan

---

[2] Drug Enforcement Administration. 2019 National Drug Threat Assessment, December 2019, pp. 15, available at https://www.dea.gov/sites/default/files/2020-02/DIR-007-20%202019%20National%20Drug%20Threat%20Assessment%20-%20low%20res210.pdf (last accessed Apr. 5, 2022).

USA SENT. MEM.                     5
20-480-02 WHA

noted that he could "sell them fast here." *Id.* ¶ 24.  He said he can "give them out for sixty for the gram too." *Id.*   Agents believe Ivan to be saying he could sell a single gram of fentanyl for $60. *Id.* ¶ 25. Leydis responded, "Uh-huh, yeah, because nobody has any, you can raise it up," meaning Ivan could charge an even higher price because few drug dealers had blue fentanyl for sale. *Id.* ¶ 24-25.  With her final comment, Leydis made clear that she knew how profitable fentanyl dealing was at the time.  On another call, Carrero told Leydis that she made $1,300 by selling a "whole one," likely a whole ounce of fentanyl.  Paidipaty Decl., Exhibit A, Line Sheets, Call 449.  There is no question that the aim of the DTO was to make money from distributing a highly lethal drug.

Finally, on two occasions, Leydis, along with Carrero sold powder fentanyl and counterfeit prescription pills containing fentanyl to an undercover agent.  During the first sale, Carrero sold an initial quantity of fentanyl to the UC.  Dkt. 1, Compl. ¶ 71.  When the UC asked if Carrero could sell additional amounts of fentanyl, Carrero called her mother to see if she had more drugs available.  *Id.* ¶ 72.  Leydis indicated that she had "one," meaning one additional ounce of fentanyl that they could sell to the UC.  *Id.*  About five minutes after that conversation, Leydis arrived at the location where Carrero was waiting with the UC and provided the additional drugs.  *Id.* ¶ 73.  Based on chemical testing, the two in total sold 123 grams of fentanyl that day for which they charged $7,800.  *Id.* ¶ 75-76.

A few months later, Carrero sold 1,000 counterfeit pharmaceutical pills containing fentanyl to the UC.  *Id.* ¶¶ 91-100.  Again, the UC asked if Carrero could sell an additional set of pills of 700 pills. *Id.* ¶ 99,101.  Carrero then communicated with her source of supply to see if he could provide the additional drugs.  *Id.* ¶ 102-103.  The supplier indicated that that he would have a courier bring the drugs to Carrero.  *Id.*  After that call, Leydis walked by the area where Carrero was meeting with the UC.  *Id.* ¶ 104.  She entered the UC's car, where Carrero was already seated.  *Id.*  Carrero noted, "… he wants another 700." *Id.*  Leydis replied, "Did you already ask for them?" *Id.*  Carrero indicated that she did. Leydis asked, "Are they going to bring them to you?" *Id.*  Carrero answered, "Yeah. They are going to bring them." *Id.*  Leydis's comments indicate that she knew who the supplier was and how to procure the additional drugs.  Shortly thereafter, the courier arrived with the additional 700 pills that Carrero and Leydis sold to the UC for $5,000.  *Id.* ¶ 106.

Federal agents across the country have seen an increase in the sale of fentanyl-laced pills.  Often

referred to as "M-30s" because they typically are etched with the letter M and the number 30, which are the markings on oxycodone tablets, these pills can contain lethal doses of fentanyl. In reaction to the sheer volume of pills seized recently, the Drug Enforcement Administration, in September 2021, issued its first Public Safety Alert in six years to increase awareness of the prevalence of these drugs on the black market. The DEA alert noted that lab analyses revealed that "two out of every five fake pills with fentanyl contain a potentially lethal dose."

### B.   For years, Leydis assisted others in evading law enforcement.

While Leydis has no prior criminal convictions, this case is not her first interaction with law enforcement. In 2005, Leydis was deported after being apprehended by U.S. Border Patrol in Texas. At some point afterwards she re-entered the country. *See* PSR ¶ 44. Since then, she has served as a custodian on immigration bonds for both of her children who were juveniles at the time; on each occasion the children failed to appear for any further hearings. For example, in August 2012, immigration officials released Emilson into Leydis's custody on the condition that he would appear for a hearing. Emilson never appeared. The same thing happened again in February 2014 following Emilson's arrest on unrelated conduct. In 2018, Leydis bailed Carrero out of immigration custody, promising to make future appearances at hearings. True to form, no future hearings were attended. That same year, Leydis signed an immigration bond for co-defendant Ana Maldonado, who was juvenile at the time. Again, Maldonado failed to appear at any subsequent hearings and has since absconded even in this case. *See* Paidipaty Decl. ¶ 5. Leydis's actions evince a willingness to make representations to the a court with no intent of honoring them.

Additionally, intercepted calls show that Leydis is willing to lie for others to assist them in evading authorities. As noted in the Criminal Complaint, the Honorable Jon S. Tigar, U.S. District Judge, authorized the interception of wire communications over phones used by Leydis and Carrero. On August 24, 2020, Carrero received a call from a sheriff's office that was inquiring about an individual named Jason Mayorquin. Paidipaty Decl., Exhibit B, Line Sheets, Calls 97, 99. Carrero indicated that Jason was her cousin. *Id.*, Call 99. The representative from the sheriff's office said they needed to get in contact with Jason. Carrero stated that she did not have his new telephone number but could try to contact him on Facebook. *Id.* The sheriff's office representative asked Carrero to report back if she was

able to find a contact phone number. *Id.*

A few hours later, at approximately 5:08 p.m., Leydis called Carrero to discuss Jason. A transcript of that call follows:[3]

| | | |
|---|---|---|
| CARRERO | | [Aside: Yes, I'm going to (U/I)[4]] Mommy. |
| LEYDIS | | Nicole,[5] I forgot to tell you, Jason [U/I] ankle bracelet, did he mention it to you? |
| CARRERO | | Yes, he just told me. |
| LEYDIS | | Oh yeah, and right now that I just got out of the bathroom, I was going to tell you. He told me if I asked you. You only know… |
| | | [Voices Overlap] |
| CARRERO | | He told me, [Audio Glitch] [U/I] but it is a long time. [Audio Glitches] He said. Just a long time. [Pause] |
| LEYDIS | | All right, [U/I] [Audio Glitches]. |
| CARRERO | | Huh? |
| LEYDIS | | Whenever they call you again, just tell them, you know nothing about him. |
| CARRERO | | [U/I] [Audio Glitches]. |
| LEYDIS | | Yes, it won't benefit you for you to continue answering. |
| CARRERO | | Yeah. |

Based on the context of the call, it appears that Carrero's cousin was subject to court supervision based on the reference to an ankle monitor. The call indicates that during the conversation, Leydis coached Carrero to lie if the authorities ever called her again. Leydis cautioned, "Whenever they call

---

[3] The original call was conducted in the Spanish language. Spanish linguists prepared the transcript referenced here, which was provided by the government to defense counsel for both Leydis and Carrero. The transcript is attached as Exhibit C to the Paidipaty Decl.

[4] The notation U/I indicates that a certain portion of the intercepted conversation was unintelligible to monitors.

[5] Nicole is one of Carrero's aliases. According to some criminal history records, it may be Carrero's middle name.

again, just tell them, you know nothing about him." Leydis clearly knew this was a lie and that Carrero in fact was in contact with Jason as she asked whether Jason had mentioned the "ankle bracelet." Carrero agreed to her mother's plan at the end of the call.

The Court's sentence in this case must send a message that continually lying to authorities will not be tolerated.

### C. A 41-month sentence appropriately factors mitigating circumstances in this case and avoids unwarranted sentencing disparities.

The government and Probation's sentencing recommendation incorporates a one-level downward variance from the advisory Guidelines range. The variance is warranted for two reasons. First, the PSR details Leydis's traumatic past, which involved physical abuse at the hands of family members and romantic partners. Under the sentencing factors, the Court should consider the defendant's past circumstances in assessing how she came to be involved in criminal activity.

Second, the sentence ensures that the Court avoid unwarranted sentencing disparities as required by statute. To date, the Court has sentenced three co-defendants in this case:

| NAME | SENTENCE | KEY FACTS/SENTENCING FACTORS |
|---|---|---|
| Emilson Cruz Mayorquin | 51 months in custody | Along with Leydis, Emilson is the most culpable in the organization. He sold the most fentanyl of any of the co-conspirators and for the longest period of time. The sentence was a one-level variance from the Guidelines. The Court stressed the high volume of Emilson's drug sales, but also recognized his youth and that this was the longest sentence he will have served. |
| Pamela Carrero | 19 months in custody | Carrero was primarily a street-level dealer but sold significant quantities of fentanyl to an undercover agent on six occasions. The sentence was a significant downward variance. The Court noted that the defendant was quite young at the time of the crime and that she may lose parental rights over her minor son, which is a considerable collateral consequence. |
| Adonis Torres | 27 months in custody | Torres was a street-level dealer who was lower in stature than the others sentenced, however did not meet the statutory thresholds for a minor role reduction. While he distributed a lower quantity of drugs than other co- |

|  |  | defendants, his immigration history was worse. He had been deported at least five times and sustained two criminal convictions for illegal re-entry. The Court credited Torres for entering a plea early in the case. |

In comparing the imposed sentences and factors considered by the Court in these prior cases, a 41-month sentence is an appropriate balancing of the variance interests at play here. Leydis is one of the most culpable defendants in the case. She was looked to even by her co-conspirators as a fentanyl supplier. In contrast to Emilson and Torres, however, she has no prior criminal convictions. Further, and as the Court considered in sentencing Carrero, Leydis faces a potentially life-altering collateral consequence based on the pending state custody proceeding. At this time, the state case remains pending and based on prior rulings by the presiding state court judge, the federal government cannot access and provide this Court with information regarding that case. Regardless of the outcome of the state matter, the government understands that even the prospect of losing one's child constitutes a collateral punishment.

A further variance akin to the variance granted to Carrero, however, is not warranted. Leydis was far more culpable in the conspiracy than her daughter and cannot blame her actions on youth or inexperience. She was quite literally the adult in the room. The government recognizes the mitigating circumstances in this case, but it cannot undo the seriousness of the offense conduct and the effects of that conduct on those living in this District.

## V.     CONCLUSION

The United States respectfully requests that this Court impose a sentence of 41 months' imprisonment, followed by four years of supervised release, a mandatory $100 special assessment, and forfeiture of the electronic devices identified in the plea agreement.

DATED: April 5, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney


_____/s_____
SAILAJA M. PAIDIPATY
Assistant United States Attorney